# CASE# 1:20-cr-05544-NLH

## Supplemental Addendum #14.a.

## Update: The Truth of the BOP's Mismanagement of Covid-19 at Fort Dix Prison

(1) "Even in the best run prisons, officials might find it difficult if not impossible to follow the CDC's guidelines for preventing the spread of virus among inmates and staff practicing fastidious hygiene and keeping a distance of at least 6 feet from others" citing: United States v. Gorai, 2020 US Dist LEXIS 72893 (D. Nev. Apr. 24, 2020).

(2) Courts have described in meticulous detail the history of FCI Fort Dix's experience with, and response to Covid-19, Eg., Wragg v. Ortiz, 2020 US Dist LEXIS 92033, Slip Op. at 4-27 (D. NJ, May 27, 2020). The Wragg v. Ortiz opinion contains many disturbing accounts from inmates about Covid-19 procedures and health conditions at Fort Dix. (Id. at 14-27).

(3) As of November 11, 2020, according to the Bureau of Prisons: 229 inmates and 12 staff members at Fort Dix have tested positive for Covid-19. 41 inmates, and 6 staff have recovered. None so far have died. https://www.bop/coronavirus/ (viewed on 11/11/2020).

(4) "While during this past summer, parts of the United States appeared to be seeing a slowdown in the spread of Covid-19, the same was not true for the summer epicenter of the Covid-19 pandemic; prisons and jails. See NY Times article, June 16, 2020. https://www.nytimes.com/2020/06/16/us/coronavirus-inmates-prisons-jails.html ("Cases of coronavirus in prisons and jails across the United States have soared in recent weeks, even as the overall daily infection rate in the nation has remained relatively flat...[a]nd even the known case numbers are likely a significant undercount because testing has been extremely limited inside prisons and because some places that test do not release the results.")

The BOP infection rate far exceeds the national average, with those in BOP Custody infected at a rate demonstrably higher than those outside BOP custody:



RECEIVED
DEC 16 2020



Infections/1,000 People

(collected from www.bop.gov/coronavirus, htps://coronavirus.jhu.edu/map.html includes number of federal inmates in BOP managed institutions, the number of inmates in community based facilities, and the number of inmates who have died from Covid-19. (Numbers as of 8-28-20).

And the United States knows these numbers will continue to climb, recognizing in briefings across the country that "despite extensive measures to prevent the transmission, more federal inmates will inevitably contract Covid-19 going forward." See US v. Conner, 2020 WL 3053368 at *8 (N.D. Iowa, June 8, 2020).

Indeed, as the winter months approach, the increase of Covid-19 cases has been rising at an unprecedented and alarming level, (especially at Fort Dix.) https://www.nytimes.com/live/2020/10/26/world/covid-19-coronavirus-updates ("with the coronavirus spreading out of control in many parts of the United States and daily count cases setting records, health experts say it is only a matter of time before hospitals reach the breaking point ... there are more than 41,000 Covid-19 patients hospitalized in the United States, a 40 percent rise in the last month.") As the situation regarding the pandemic in the United States worsens considerably, the situation in the prisons of the United States is even

more grim.

(5) The CDC, various Federal Judges/Justices, as well as multiple governmental, and non-governmental health organizations all agree that social distancing is "the cornerstone" of reducing transmission of Covid-19, and the further mitigation of the undeniably high risk of irreprable harm posed by the contraction of Covid-19 contagion.

(6) It is very clear that Fort Dix's mitigation measures fall well short of the CDC's guidelines on multiple levels. And clear and undisputable failure is evident in the simple fact that due to internal physical configuration of the confinement structure of the inmate housing units at Fort Dix Prison, it is impossible to maintain 6' social distancing as per CDC guidelines. Said Fort Dix housing units' internal configuration is open in that it allows, and of necessity places inmates and staff together continually mixing in very close physical proximity to each other (much less than the required 6 foot separation), and yet at the same time the internal physical configuration of the housing units are constraining; even with a reduced population of inmates; due to the confined spaces within the housing units, it is also in that regard impossible to maintain the minimum CDC recommended 6' social distancing.

In short; we, inmates and BOP staff, are like sardines stuffed into one monolithic can with the lid tightly sealed.

(7) The BOP and Fort Dix administration are well aware of the risk that the virus could easily spread rapidly through its congregate inmate population. And are further aware that addressing that risk would require precautionary provisions, and safety measures that they simply are unable to execute due to the inability to separate inmates so as to meet the required CDC quidelines.

(8) The BOP was advised to reduce its population, but quite in fact in opposition to that advisement, in the middle of the pandemic, at the moment of a second wave of infections, and increased resurgence of Covid-19 at Fort Dix prison, the BOP instead is now increasing Fort Dix's population by busing in more inmates from other prisons. At the very moment the BOP should be focused on keeping inmate population at Fort Dix Prison as low as possible, they are transferring more inmates into Fort Dix Prison and this also in the face of their statements that they are not doing so.

(9) Regardless of the deceptive empty lip service the BOP places forth, it is well established in the evidential findings that the BOP knowingly disregards the excessive risk to inmate health and safety as manifestly self evident by

their repeated, habitual inconsistencies, and ineffectiveness in containing the spread of Covid-19 to Fort Dix Prison and within the boundaries of Fort Dix Prison.

(10) Subsequent to not being able to provide the required CDC 6' social distancing recommendation, additionally BOP provided inmate face masks are unsatisfactory in stopping fine particle contagion transmission. Yes, the wearing of N-95 or finer filtration masks does substantially mitigate the spread of Covid-19. But the wide mesh, cotton cloth masks provided by the BOP to inmates does not stop the microfine particulates that can float in the air for hours after an infected person exhales.

Furthermore, even if inmates and staff were all supplied with N-95 masks, it is impossible in such low BOP staffed/high inmate population for the BOP to force inmates to continually wear their masks, especially while sleeping in overcrowded stagnant ambient breathing conditions. Conditions wherein all inmates in a room breath each others exhaled air all night long.

It is additionally impossible for staff to force all inmates to continually wash their hands. And now many of the hand soap dispensers are breaking and as of yet have not been replaced. I often watch inmates use the bathroom and use only plain water to wash their hands, or not wash their hands at all.

(11) In a recent Order, a Court granted compassionate release of an inmate at Fort Dix, stating that most of the inmates at this "heavily populated correctional facility" have not been tested, and compares this prison's strategy to "<u>ignorance is the best policy</u>" US v. McNish, 2020 US Dist LEXIS 173048 Slip Op. at 6, 8 (E.D. PA, 9/22/20).

(11a) On October 26, 2020, New Jersey's U.S. Senators Cory Booker, and Bob Menendez sent a letter to the U.S. BOP calling the situation a "rapidly escalating crisis." The situation, they said, demands an indefinite moratorium on inmate transfers and immediate testing of all staff and prisoners. "It is clear the BOP does not have an effective plan to ensure COVID-19 positive inmates are not transferred between facilities," they wrote the BOP Director Michael Carvajal. They added, "All FCI Fort Dix inmates, staff, and the surrounding communities are now at increased risk for contracting Covid-19 with potentially deadly consequences."

(12) I assert and testify and is easily verifiable that as of November 11, 2020, despite an explosion in Covid-19 positive inmates over the last 6 to 8 weeks, FCI Fort Dix is still not testing the general population, and is not conducting

general population temperature checks as it did for a period of time last spring. Yet the CDC guidelines are clear: Updated CDC guidelines now recommend daily symptom and temperature screening in any correctional facility with a (one) reported case of Covid-19. U.S. Supreme Court 2020 US LEXIS 3629:: Barnes v. Ahlman:: Aug. 5, 2020, Dissent by The Honorable Justice Sotomayor, paragraph 2.

(13) Not only does BOP/Fort Dix Prison violate the CDC guidelines. Furthermore Fort Dix Prison has misrepresented its actions to the court and failed in multiple additional instances and scenarios to safeguard the health of inmates in its care. The Federal Bureau of Prisons has proven to be ill-equipped to manage the federal prison system and has badly handled the directive of Attorney General Barr made early in the pandemic. http://www.nytimes.com/2020/06/25/opinion/coronavirus-prisons-compassionate-release.html?smid=fb-nytopinion&smtyp=cur ("The Bureau's response has been dysfunctional to the point of cruelty.") Astonishingly, the BOP has advised many inmates that they had been approved for release due to the pandemic, only to be told later that a mistake had been made and that they would not be released. Id., Woodard v. U.S., Id. ("[t]he Court is aware of the growing evidence of the BOP's chronic mismanagement of its vulnerable population during the Covid-19 pandemic.") US v. Rodriguez, Id., 202 WL 1627331 at *9 ("The BOP's containment measures have already proven insufficient to prevent the spread of Covid-19."

In short it is clear they are playing Russian Roulette with the lives of medically vulnerable inmates such as myself that are placed in their care and safekeeping by the Honorable Federal Courts of the United States of America.

(14) During the current resurgence of Covid-19 in the worldwide general populous and inside the confines of Fort Dix Prison, the BOP is still transferring inmates from other prisons to Fort Dix Prison and within Fort Dix; housing unit to housing unit.

Case in point: on 11-11-20, 20 inmates were placed in my housing unit (5741). Upon interview of these inmates, they said they were held in 5851 for (2) weeks after arriving at Fort Dix Prison from different locations outside Fort Dix Prison.

During their period of (2) weeks in 5851, they testify that about (70) inmates from 5812 (the infected building as witnessed in Exhibit "J") - about 70 inmates were moved into their building (5851). 70 inmates from the infected

building (5812) moved to (5851). This is the same group of 70 inmates that were removed from 5812 when it was discovered that approximately 150 inmates in 5812 were infected, they were removed from 5812 and placed in 5851. Subsequently, at least one of those inmates from 5812 (Joshua Moses) that had previously tested negative, subsequently tested positive for Covid-19 after being in 5851 for a brief unspecified amount of time. Said inmate that subsequently tested positive was moved back to 5812 which had become another quarantine unit. Subsequent to all these events of cross contamination, the originally reference 20 inmates from 5851 were; on 11-11-20, placed in my building (5741). To see the full details of this negligent mismanagement, and reckless disregard for inmates safety and security see "Exhibit J", and the commentary **contained here in, at (19).**
(15) Another case in point: On Wednesday, 18th of November, 2020, approximately 26 inmates were moved into my housing unit (5741), moved from 5703 (the quarantine unit). One of these inmates was moved into my room. He sleeps directly over me in the top bunk. And where is he from? Elkton Federal Prison that's where. He states he was held in quarantine in 5703 after arriving at Fort Dix (2) weeks prior to being transferred into 5741. And now this Elkton inmate sleeps directly above me. And this Elkton inmate is very often seated beside my bed 2.5 feet from where I sit on the opposite side of my bed.
(16) Another case in point: On the same day they moved those inmates from 5703 into my building (5741) (Nov. 18, 2020) a number of inmates questioned the C.O. about how many more inmates were going to be transferred into our building. He said he did not not. But he did know that Fort Dix administration was clearing out all the inmates from 5703 (the quarantine building) so they could fill it up with more inmates from other facilites. He added (2) buses of inmates would be arriving next week to repopulate 5703.
(17) And the BOP/Fort Dix's deception/mismanagement should be no suprise in that historically the Federal BOP continually exhibits the same deliberate indifference, and malignant behavior of mismanagement. Case in point: "The Compassionate Release Statute of 2013": The poor response of the BOP to A.G. Barr's directive earlier this year is not to surprising given the BOP's initial response to the Compassionate Release Statute in 2013. Indeed, the Department of Justice itself found that the BOP did not "properly manage the compassionate release program..." See U.S. Dept. of Justice, Office of the Inspector General, the Federal Bureau of Prisons' Compassionate Release Program 1 (2013). https://www.oversight.gov/sites/default/files/oig-reports/e1306.pdf.

(18) The the BOP has formally adopted a policy to mitigate the risk of, attempt to isolate and contain Covid-19, its actual compliance, and implementation is piecemeal and unsatisfactorily inadequate. Piecemeal and unsatisfactorily inadequate in the face of such dangerously deadly high risk conditions of confinement for those with vulnerable pre-existant medical conditions such as myself. Piecemeal and unsatisfactorily inadequate in compliance and implementation of a supposed excellently crafted written policy. Regardless of their supposed excellently crafted written policy of Covid-19 mitigation, the reality of the matter is the BOP has and continues to unnecessarily, through a combination of incompetance and deliberate indifference exposed and continues to expose its inmates to significant unnecessary risks from highly contagious, and potentially deadly disease. And simultaneously attempts to cover its corrupt actions with lies thereof.

(19) Another case in point of the BOP/Fort Dix's incompetence/deliberate indifference/gross negligence. Reference "Exhibit J"

News article Dated Nov. 10, 2020 —(Commentary below)

At some point prior to October 29, 2020, all inmates in Building 5812 of FCI Fort Dix were tested for Covid-19. Then on October 29, at a town hall meeting where all inmates were present, BOP officials place forth a list of approximately 70 inmates. All inmates were informed, to assume they tested positive if they did not find their name on the list. Further, the inmates on the list who were assumed to have tested negative were moved from 5812 to another housing unit. Thus 5812 effectively became a quarantine unit. Inmate Joshua Moses of 5812 was listed on the list of those who had tested negative at some point prior to October 29, 2020. That night, (the inmates of 5812 who were assumed as being free from the Covid-19 contagion having been tested at some point previous to October 29, 2020) they were moved to a different building. But within days, he too (Joshua Moses) was feeling lethargic and feverish. He tested positive, and was instructed to carry his mattress and belongings back to quarantine (5812).

Your Honor, this very situation exemplifies the abject mismanagement/execution of testing/violation of quarantine procedures characterized as piecemeal and inadequate through a combination of incompetance and deliberate indifference: When the BOP discovers one or more inmates is/are infected with Covid-19, they remove those supposed uninfected inmates to another housing unit as clearly evidenced in the news article Exhibit J. This moving of

supposed uninfected inmates from a housing unit where in they had lived in a confined, close-contact living condition with inmates that had previously tested positive for Covid-19, moving the supposed uninfected inmates to another housing unit, thus potentially causing the spread of the virus to other inmates in other housing units and/or correctional officers. How? Here's how: They tested all inmates in 5812 at some point before October 29, 2020. Based on the evidence presented of Joshua Moses testing negative prior to October 29, and later testing positive very shortly thereafter being moved to another building. One can only surmise that Mr. Moses became infected while he remained in 5812 at some moment during the interval that transpired between the time all inmates in 5812 were tested and the moment he was moved from 5812, i.e., the time elapsed between a Covid-19 test being given and the results being received vis-a-vis; some hours, 1 day - 2 days, etc.

For example, if all inmates in a housing unit are tested: say 100 total tested and say 50 test positive, 50 test negative and yet the results are only available one or more days after the fact of administering the test, mean while all 100 inmates continue to interact confined in the same close contact living conditions of confinement. How does the BOP know that additional inmates of the yet to be discovered negative test resultant group were not infected during the elapsed interval between the moment the entire unit of 100 inmates were tested and hours or days later when the 50 were confirmed to be infected? The unequivocal answer is they can not know even hours later after administering a test, who is positive and who is negative when all inmates are in constant close contact living conditions as is existant at Fort Dix low security prison. The whole point is this: Quite in fact if one person in a unit tested positive every inmate in that unit should be assumed positive for safety sake and none moved from that building. Effectively all inmates should be on quarantine. I believe this is universally accepted medical protocol. And even if I am mistaken - These actions by BOP officials knowingly disregard common sense measures of health and safety and place more and more inmates at excessive risk of contraction of Covid-19 and the very real danger of premature death there of. This one inmate, Joshua Moses could have easily spread Covid-19 to another unit that previously had not evidence of infection. And this is only one inmate of the 70 that were moved. I think I not need to belabor the point of the dire situation that could be created by the miserable deliberate indifference and the gross negligence of gross mismanagement of Covid-19 by BOP officials at Fort Dix

Prison: In short a super spreader scenario could easily unfold by one wrong action of BOP officials regardless of how well a written policy they place forth. But this is the type of incompetence, deliberate indifference, and gross negligence inmates confront on a daily basis. The dire situation I find myself in, having a combination of multiple suspect vulnerable health conditions in light of Covid-19 has brought to light the pre-existant elemental, constitute failure of a corrupt system of imprisonment, that allows the oppression of citizens and violates their human rights.

(20) Another case in point: During the recent major outbreak of Covid-19 at Fort Dix Prison inmates were still being transferred to the Drug Program at Fort Dix Prison located in housing unit 5852. Transfers were from both inside Fort Dix Prison and from other facilites. And the fact is it would only require one infected inmate to infect the entire housing unit of apprixmately 200 to 368 inmates. Well, Your Honor, I believe that one inmate has been identified. On 11-14-2020, a Federal Corrections Officer has anonymously confirmed the first case of Covid-19 among Drug Program participants in building 5852. Some time during the week of November 9, 2020, said infected individual was identified and the drug program suspended. And now since one inmate has tested positive in 5852, will they investigate the origin of the infected inmate? Will the BOP use contact tracing to identify and isolate every individual that the infected inmate came into contact with, both inmates and BOP workers, and Federal Marshals? Will the BOP test all contact traced individuals? Will the BOP follow standard medical protocol and procedure or will they bury their head in the proverbial sand and continue to follow "ignorance is the best policy" as cited by a Federal Judge in U.S. v. McNish, 2020 US Dist LEXIS 173048 Slip Op. at 6, 8 (E.D. Pa, 9/22/20)? Will the BOP now remove that one inmate to another building, possibly spreading more Covid-19 contagion? And how do they know whether other inmates and BOP staff in 5852 are not also infected? Thus this could be a repeat scenario, the mise-en-scene fully furnished with, not actors, but real life participants in a tragic unfolding of events as transpired and evidence in "Exhibit J: News Article dated November 10, 2020".

Will the BOP consider all inmates in 5852 as infected and quarantine the entire building? Or will they begin to play Russian Roulette as they did in building 5812, using flawed procedures to pick and choose a corrupt redistribution of inmates to other housing units, thus possibly creating cascading super spreader scenarios of multiplicative actuation? For details of

their previous and recent scandalous debacle see Exhibit J, and commentary **contained here in, at(19).**

This "ignorance is bliss" approach by the Federal BOP is not only unacceptable ideology and behavior unbecoming taxpayer supported government officials, but places; inmates, BOP employees and the general populace unnecessarily at risk. A Federal Judge commenting in a case related to Federal Prison Allenwood Low, Reference: (Loyd v. U.S., 2020 WL 2572275 (ED Mich., 5-21-20)) states the underlying attitude of deliberate indifference to the seriousness of the spread of Covid-19: "zero confirmed cases is likely more a result of lack of testing than a lack of the virus' presence in the prison. If anything, the Court is more concerned that inmates and staff members are interacting with one another as normal and blissfully unaware of the virus spreading throughout the system." (I)nmates currently, "eat, sleep, and interact with each other in a confined space, making it easier for the virus to spread once introduced. Inmates are still being transferred between facilites. Although they are screened for symptoms, they are not tested for the virus, leaving potentially asymptomatic individuals to spread the virus to others. In low security facilites, inmates are being quarantined with their own unit, as opposed to individual cells, preventing them from complying with social distancing recommendations."

The haphazard manner in which BOP officials use in transferring inmates not only endangers the lives of inmates and BOP workers, but as well endangers the surrounding community at large. The mere fact; in the middle of the pandemic, that inmates are still being transferred between prisons clearly exemplifies deliberate indifference, negligent mismanagement and gross negligence in the light of past deadly Covid-19 outcomes. Additionally, the transfer of inmates during this highly volatile moment of Covid-19 resurgence is bad enough, but even worse, they do not test inmates for the virus before transfer, only screening them for symptoms, leaving potentially asymptomatic individuals to become super spreaders of the virus to other inmates/prisons, BOP workers/ and the surrounding general populace.

When a reasonable, morally minded person thinks about these things in relation to the thousands of evidential deaths that have already occurred, such a person cannot help but to be shocked and outraged at this despicable, despotic, oppressive violation of a human being's right, not to be knowingly exposed to a known, deadly contagion by a representative government of the

United States of America.

No matter what an inmate's crime may have been, such confinement, and mistreatment far exceeds the punishment meted out by an Honorable Court.

Said corrupt situation makes one wonder: Is the BOP/Fort Dix Prison trying to indirectly exterminate inmates by directly exposing them to a known, deadly contagion?

(21) As related to Covid-19; in simple layman's terms, the BOP has knowingly conducted and continues to knowingly conduct "a dog and pony show"; i.e. make everything sound good for itching ears, and everything look good for the proverbial camera, but all along ignoring the facts, in the hopes that everyone else will ignore the facts as well.

All the while behind the scenes of a supposed well orchestrated facade is the discombobulated, and convoluted pretense of impeccable management, with the pretense of a supposed satisfactory execution of safety and security for all involved. But it is just a very unstable, high rise house of cards as multiple evidentiary facts assert and testify to the fallacy of the BOP's well orchestrated facade.

(22) In the event of indicators of improvement related to Covid-19 positive inmates; improvement and/or reduction of Covid-19 positive tested inmates, does not conclusively establish that the Covid-19 outbreak at FCI Fort Dix has been contained. Many inmates are asymptomatic, thus the virus remains active in the prison and with the impossibility of adequate social distancing; as unanimously attested to by multiple experts, remains unchanged, thus, absent additional evidence, we must assume for purposes of my present motion; no matter the quantity of reported negative/positive cases at Fort Dix Prison, I am still at a heightened risk of contracting Covid-19 as long as I remain confined at Fort Dix Prison.

(23) As a habeas corpus petitioner I assert, based on all the evidence of conditions of confinement as related to my verified vulnerable pre-existant medical conditions, that no set of confinement conditions would be constitutionally sufficient. My claim challenges the fact and/or extent of confinement rather than the mere conditions of confinement and improvement thereof. For those with vulnerable health conditions such as myself, there are no conditions of confinement within the structure of Fort Dix Prison sufficient to prevent possible irreparable physical harm and constitutional injury. I assert that no set conditions would be constitutionally sufficient to mitigate

injury. My challenge is the legality of confinement and not the mere conditions thereof. Adam v. Bradshaw, 644 F. 3d 481 (6th Cir, 2011) cf. Terrell v. U.S., 564 F. 3d 442, 446-48 (6th Cir, 2009). The Supreme Court has held that release from confinement - the remedy petitioners seek here - is "the heart of habeas corpus" Preiser v. Rodriguez, 411 U.S. 475, 498, 93 S. Ct. 1827, 36 L. Ed. 2d 439 (1973).

(24) Based on the evidence presented it is evidently clear the BOP/Fort Dix Prison is deliberately indifferent, with malignant mismanagement and gross negligence to the serious risk of harm presented by Covid-19 for inmates such as myself with pre-existing vulnerable health conditions. This assertion is evident both subjectively and objectively.

Subjectively: it has been demonstrated that BOP/Fort Dix officials "know of and disregard the excessive risk of harm to inmates" such as myself "with known pre-existance vulnerable health conditions". "And it is, indeed fair to say that acting or failing to act with deliberate indifference to this substantial risk of serious harm" to my person "is the equivalent of recklessly disregarding that risk," by continuing to confine me at Fort Dix Prison.

Objectively: The evidence is also clear that the BOP/Fort Dix Prison has continued and does continue to incarcerate my medically vulnerable self "under conditions posing a substantial risk of serious harm."

Deliberate indifference and gross negligence are questions of fact subject to demonstration in the usual ways, including inference from circumstantial evidence. This is especially true where, as here, the BOP/Fort Dix Prison substantially and utterly fails in its applying basic morality and ethics to the facts and equities before it, as related to my being confined in high risk environmental living condition with vulnerable pre-existant medical conditions, as opposed to releasing me from confinement at Fort Dix prison by the efficacy of, home confinement, compassionate release, sentence reduction or any combination thereof.

Yet courts have granted compassionate release to a substantial number of medically vulnerable prisoners at Fort Dix, a diverse group in terms of their ages and medical issues, criminal charges, and time remaining on their sentences: United States v. Pagliuca, N. 17-432 (cs) (granting compassionate release to an inmate at Fort Dix serving a 10 year sentence for child pornography offenses); U.S. v. Pena, No. 15-cr-551 (AJN), 2020 WL 2301199 (S.D.N.Y., May 8, 2020) (granting compassionate release to an inmate at Fort Dix

with hypertension); U.S. v. Williams, No. 3:17-cr-121-(VAB)-1, 2020 WL 1974372 (D. Conn., Apr. 24, 2020) (granting compassionate release to Fort Dix inmate with asthma, diabetes, and hypertension); U.S. v. Logan, No. 1:12-cr-00307-LEK, Dkt. N. 140 (N.D.N.Y., Apr 22, 2020) (granting compassionate release to Fort Dix inmate with diabetes, high blood pressure, and other medical issues); U.S. v. Patrick Jansen, No. 1:20-cv-01542 (SEB-MPB) Dist 7th (Nov. 25, 2020) (granted compassionate release to Fort Dix inmate serving 15-year sentence for child pornography offense, with pre-existing medical conditions of BMI classification obesity, former smoker, and heart arrythmia).

I believe the merits of my case, the overwhelming evidence placed forth clearly indicates the validity of my assertion both subjectively and objectively that the BOP is guilty of deliberate indifference and gross negligence in its handling of Covid-19 and its refusal to grant my request for release from Fort Dix Prison with the additional implication of systematically attempting to cover up the facts of their malignant mismanagement.

I again respectfully ask this Honorable Court to grant my request and please release me from this unconstiutional confinement, by the efficacy of whatever statute the Honorable Judge Hillman deems appropriate.

Case # 1:20-cr-05544-NLH

―――――――――― Supplemental Addendum #14.a.(1) ――――――――――

―――――――――――――――― Exhibit: J ――――――――――――――――

―――――――――― News Article Dated Nov. 10, 2020 ――――――――――

- A Very Sad Situation -

On October 29, the prisoners of Building 5812 at FCI Fort Dix, the low-security prison in New Jersey, were invited to a town hall meeting about the Covid-19 outbreak raging through the facility.

A list of about 70 inmates had been posted behind plexiglass. The remaining 150 inmates who could not find their names on the list were told to assume they had tested positive, advocates said. Their cell block was now a quarantine unit. One, Troy Wragg, whose complex medical conditions had already left him wheelchair bound, had been the lead plaintiff in a lawsuit filed by the ACLU of New Jersey seeking release for a class of medically vulnerable people. A federal judge dismissed the case in May. Now, Wragg wrote to his wife, his fears had been confirmed. "I am sick. It is official. Prayers and hard work are all that will help."

Families and advocates are raising alarms about the conditions at Fort Dix, where 229 prisoners and 12 staff are now sick. They say the outbreak was preventable and blame the Federal BOP for transferring 150 prisoners this fall from Ohio's FCI Elkton, where more than 1,000 prisoners and staff have been infected.

On Monday afternoon, New Jersey's U.S. Senators Cory Booker, and Bob Menendez sent a letter to the U.S. BOP calling the situation a "rapidly escalating crisis." The situation, they said, demands an indefinite moratorium on inmate transfers and immediate testing of all staff and prisoners. "It is clear the BOP does not have an effective plan to ensure COVID-19 positive inmates are not transferred between facilities," they wrote the BOP Director Michael Carvajal. They added, "All FCI Fort Dix inmates, staff, and the surrounding communities are now at increased risk for contracting Covid-19 with potentially deadly consequences."

The Bureau of Prisons did not respond to a request for comment on Monday afternoon. As recently as mid-October U.S. Attorneys opposing compassionate release motions by Fort Dix prisoners argued that "the BOP has taken effective steps to limit the transmission of Covid-19."

Videos purportedly taken by a prisoner inside 5812 and circulating among family members show a unit in chaos, debris scattered and trash overflowing, a

byproduct of a shortage of staff and healthy inmate workers, according to family members. Wragg's wife, Megan Hallett Wragg, 28, said her husband sounds hoarse and out of breath. "He barely has a voice. It's very raspy. He's coughed up blood from coughing so much. Everybody there just walks around like zombies," she said.

Shannon Clark Moses, said her husband Joshua, 39, was in the same unit as Wragg. "There's no way we can socially distance," he told her. He described hanging towels around his bunk, a fort to keep out the disease.

On October 29, Joshua found he was on the list of those who'd tested negative. That night they were moved to a different building. But, within days, he too was feeling lethargic and feverish. He tested positive and was instructed to carry his mattress and belongings back to quarantine.

The last time Moses heard from him, a week ago, he told her he couldn't breath. "I'm hearing about men passing out. He said, big, healthy, strong men...he's watching them pass out on the floor, and be carried off," said Moses, 39, of North Philadelphia.

The situation at Fort Dix, which has a population of 2,600, has been at the center of a series of federal lawsuits waged by prisoners seeking compassionate release. Those petitions have largely been denied by judges who cited the low incidence of infections there, but that could be changing. On November 3, a judge in the Eastern District of New York granted release for Daniel Mongelli, citing "the failure of the Bureau of Prisons to prevent and control a Covid-19 outbreak at FCI Fort Dix."

Source: George Woolston, Burlington Country Times; Philadlephia Inquirer / November 10; and the Press of Atlantic City

ards
Box 454
ard, NC 27876

U.S. District Court
ATTN: Clerk of Court
P.O. Box 2797
Camden, NJ 08101
USA

ENV. #1